FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS
Apr 9, 2026
OFFICE OF THE CLERK

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Western District of Arkansas
Fort Smith Division

IN THE MATTER OF THE SEARCH OF A BLUE APPLE 'IPHONE' WIRELESS TELEPHONE PRESENTLY HELD IN THE SECURE CUSTODY OF FORT SMITH POLICE DEPARTMENT, IN THE WESTERN DISTRICT OF ARKANSAS

Case No. 2:26-CM-19

**Filed Under Seal**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that, on the following person or property located in the Western District of Arkansas, *(identify the person or describe property to be searched and give its location)*:

**See "Attachment A" (This Court has authority to issue the requested search warrant under Federal Rule of Criminal Procedure 41).**

there is now concealed *(identify the person or describe the property to be seized)*:

**See "Attachment B."**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

[×] evidence of a crime;
[×] contraband, fruits of crime, or other items illegally possessed;
[×] property designed for use, intended for use, or used in committing a crime;
[ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to violations, in the Western District of Arkansas, of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution and/or possession with intent to distribute a controlled substance |
| 21 U.S.C. § 843(b) | Use of a communications facility in violating 21 U.S.C. §§ 801 *et seq.* |
| 21 U.S.C. § 846 | Attempt and/or conspiracy to commit a violation of 21 U.S.C. §§ 801 *et seq.* |
| 18 U.S.C. § 924(c) | Carrying, using or possessing a firearm in furtherance of a drug trafficking felony |
| 18 U.S.C. § 922(o) | Unlawful possession of a machinegun |

The application is based on these facts: *(See attached affidavit of FBI Special Agent Timothy S. Barth)*

[×] Continued on the attached sheet.

[ ] Delayed notice of __ days (give exact ending date if more than 30 days: ________________) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SA Timothy S. Barth FBI
Special Agent Timothy S. Barth, Federal Bureau of Investigation, *Affiant*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone call.

Date: 4/9/26

Mark E. Ford
*Judge's signature*

City and state: Ft. Smith, AR

Hon. Mark E. Ford, United States Magistrate Judge, W. D. Ark.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLUE APPLE 'IPHONE' WIRELESS TELEPHONE PRESENTLY HELD IN THE SECURE CUSTODY OF FORT SMITH POLICE DEPARTMENT, IN THE WESTERN DISTRICT OF ARKANSAS | Case No. 2:26-CM-__________<br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Timothy S. Barth, being first duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), having been so employed since September 2019. I am currently assigned to the FBI Little Rock Division's Fort Smith Resident Agency, where I am primarily tasked with conducting criminal enterprise investigations. In that capacity, I have garnered substantial training and experience in investigating violent and drug trafficking offenses, as well as in the detection, disruption, and dismantling of major drug trafficking and other criminal organizations. As an FBI Special Agent, I have employed, or assisted other investigators in employing, many techniques proven effective in such investigations, including conducting physical and electronic surveillance, recruiting and handling confidential informants, making controlled purchases of narcotics, and applying for and executing federal search and arrest warrants. I have also become familiar with how controlled substances like marijuana, cocaine, methamphetamine, fentanyl, and others are produced, packaged, transported, distributed and consumed, as well as how drug traffickers and users commonly employ mobile telephones and other similar electronic communication devices to aid those activities. With respect to such

communications, I have also become familiar with narcotics-related slang or jargon, and its standard usages or meanings when employed by illicit drug traffickers and consumers.

2. Except as otherwise noted, the statements contained in this affidavit are based in part on information provided by law enforcement officers and my experience as an FBI Special Agent. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, or that information was provided by, another law enforcement officer, the officer in question may have either direct or hearsay knowledge of the subject matter of the statement.

3. Because I present it for the limited purpose of applying for a warrant to search the wireless telephone described in Attachment A, this affidavit does not include *all* facts uncovered in the investigation described below. Instead, it includes only those facts I believe are relevant to the issue whether probable cause exists to conduct that search.

## IDENTIFICATION OF THE PROPERTY TO BE SEARCHED

4. The property to be searched, further described and depicted in Attachment A, is a blue Apple 'iPhone' wireless telephone (model number: unknown; serial number: unknown; International Mobile Equipment Identifier (IMEI): unknown; assigned telephone number: unknown) now held in the secure custody of the Fort Smith Police Department (FSPD), located at 100 S. 10th Street, Fort Smith, Arkansas, in the Western District of Arkansas, under FSPD incident/evidence number: 26018197-5 (hereinafter the "TARGET DEVICE").

5. The warrant sought would authorize the search and forensic examination of the TARGET DEVICE and its physical, electronic and digital contents for the purpose of identifying and seizing the evidence, fruits and instrumentalities of violations of, *inter alia*, 21 U.S.C. § 841(a)(1) (distributing and/or possessing with intent to distribute controlled substances), 21 U.S.C. § 843(b) (using a communications facility in committing, causing or facilitating a drug trafficking felony), 21

U.S.C. § 846 (attempting and/or conspiring to commit the above-described offenses), 18 U.S.C. § 924(c) (using, carrying or possessing a firearm in relation to, or in furtherance of, a drug trafficking felony) and 18 U.S.C. § 922(o) (unlawful possession of a machinegun) (hereinafter the "SUBJECT OFFENSES") described in Attachment B.

**VENUE**

6. This Court has authority to issue the requested search warrant because the TARGET DEVICE is presently located within the Western District of Arkansas. *See* Fed. R. Crim. P. 41(b)(1).

**TECHNICAL TERMS**

7. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. **Wireless telephone**: A wireless telephone (or wireless phone, mobile telephone, cellular phone or cell phone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones

may also include global positioning system ("GPS") technology for determining the location of the device.

b. **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. **Portable media player**: A portable media player (or "MP3 Player" or "iPod") is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. **GPS**: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the physical locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations

involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. **PDA**: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other.

8. Based on my training and experience, I know that the TARGET DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, what it was used for, the user's activities, both physical and digital, and the identities of others involved in those activities.

## PROBABLE CAUSE

9. On March 21, 2026, FSPD Officer Ryan Grayham was driving a marked patrol unit in Fort Smith, Arkansas, when he observed a Dodge Charger being driven without a driver's side mirror or a functional license plate light. Officer Grayham activated his emergency lights and stopped the Charger on Towson Avenue. When he approached the Charger's driver and sole occupant, later identified as Jaylin COLEMAN, Officer Grayham identified himself and explained the reasons for the traffic stop. In so doing, Officer Grayham detected a strong odor coming from within the Charger that he associated with marijuana, based on his training and experience. The Charger, displaying Oklahoma license plate number JJ2713, was found to be registered to COLEMAN and a female.

10. Officer Grayham asked COLEMAN for his driver's license and proof of insurance. COLEMAN said his insurance information was online, but that he could call his mother to obtain it. COLEMAN then used a blue Apple iPhone he was carrying (the TARGET DEVICE) to make a call. Officer Grayham directed COLEMAN to get out of the car, and COLEMAN eventually complied. Before and after he exited the Charger, FSPD cameras captured video of COLEMAN holding the TARGET DEVICE. The following three (3) photographs are taken from that video:



Photo 1: COLEMAN with TARGET DEVICE


Photo 2: COLEMAN with TARGET DEVICE


Photo 3: COLEMAN with TARGET DEVICE

11. In the course of the traffic stop, officers asked COLEMAN if there was anything illegal in his Charger. COLEMAN said there wasn't. Officer Grayham told COLEMAN he nonetheless intended to search the Charger, based on probable cause. COLMAN disagreed. At about this point

in the traffic stop, FSPD cameras captured video of COLEMAN using the TARGET DEVICE to tell someone the police were going to search his car. COLEMAN eventually told the officers there was "a little bit of weed" in a backpack in the Charger. He then stood at the rear of his vehicle while they searched it.

12. Inside the Charger, officers found three clear zipper baggies, each of which contained a green vegetable substance they recognized as marijuana, based on their training and experience.[1] Marijuana is a Schedule I controlled substance, under federal law. They also found a box of disposable 'vape' devices labeled as containing THC[2], an amount of THC wax, more empty zipper baggies, a digital scale, a large number of commercially packaged cigarette papers, and $691.00 in cash. Officer Grayham's report notes that "[a] total of 57 grams of THC wax, marijuana flower, and THC wax vapes" were found in COLEMAN's vehicle. Between the Charger's driver's seat and center console, officers also found a loaded Glock 19 9x19mm semi-automatic pistol with a red colored device affixed to the rear of its slide. Officers suspected the red device was a machinegun conversion device (MCD) commonly known as a "switch," or a "Glock switch." All of these items were seized from the Charger and COLEMAN was arrested on state drug and gun charges. The TARGET DEVICE was also seized. While at the jail, FSPD video shows that COLEMAN, without indicating any surprise or confusion, signed a form listing the Glock pistol as among the items seized from him.

---

[1] From images captured by FSPD, I also recognize the substances in these three baggies as marijuana, based on my own training and experience. FSPD advises these substances have been submitted to the Arkansas State Crime Laboratory for confirmatory chemical analysis.

[2] I know from training and experience that "THC" is a common acronym for tetrahydrocannabinols, a psychoactive substance found in, and sometimes extracted or derived from, marijuana. THC is itself a Schedule I controlled substance, under federal law.

13. FSPD investigators have advised me their department has received intelligence indicating that COLEMAN is, or has been, associated with a Fort Smith-area criminal street gang calling itself "1400," or the "1400 Crew." According to FSPD, "1400" is suspected of involvement in one or more homicides in the Fort Smith, Arkansas, area in recent years, as well as other criminal activity such as drug distribution. Supporting FSPD's intelligence regarding COLEMAN's involvement with the "1400 Crew," video footage from the March 21 traffic stop shows that COLEMAN has a tattoo on his forearm that reads "1400." *See* Photo 3, above.

14. Considering my training and experience, I have probable cause to believe that COLEMAN possessed the marijuana found in his Charger for purposes of distribution, rather than merely for his own personal use. Informing this conclusion is COLEMAN's simultaneous possession of multiple, individually-bagged quantities of marijuana (allowing ready distribution to more than one customer), a number of empty similar baggies (allowing for further division of the supply, as needed), a large quantity of commercially-packaged cigarette rolling papers (far exceeding what an individual smoker might reasonably require), multiple additional products labeled as containing THC (suggesting diversified product offerings), a digital scale (useful in dividing and packaging drugs for resale), several hundred dollars in cash (likely drug proceeds, considered in context) and a loaded firearm (commonly carried by drug dealers to protect their supplies). I have also learned, from training and experience, that modern drug dealers almost invariably use wireless telephones, like the TARGET DEVICE, to facilitate their illegal activities, such as by communicating with sources of supply and customers. Common uses of such devices include arranging drug transactions, sending and receiving electronic payments for narcotics, and warning criminal associates of police activity.

15. I also know from my training and experience that a "switch," like the suspected one found affixed to COLEMAN's Glock pistol, is a type of MCD that can enable semi-automatic pistols

to fire automatically. In other words, a switch can allow a compatible handgun to "shoot automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). As such, an installed and functional switch converts a compatible semi-automatic handgun into a "machinegun" within the meaning of 26 U.S.C. § 5845(b) and 18 U.S.C. § 922(o). I also know from training and experience that a switch is, by itself, a "part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." *Id.* Consequently, even an *uninstalled* switch is a "machinegun," for purposes of 26 U.S.C. § 5845(b) and 18 U.S.C. § 922(o). While 18 U.S.C. § 922(o)(2)(B) exempts from prohibition those machineguns manufactured prior to 1986, I also know that "Glock switches," like that seized from COLEMAN, were not patented as an invention until 1998.[3] Additionally, after COLEMAN was arrested, I received and viewed a video recording produced by the 12th/21st Judicial District Drug Task Force (DTF). The video shows a DTF investigator test-firing the switch-equipped Glock pistol seized from COLEMAN on March 21. In the video, the investigator can be seen firing more than one shot from COLEMAN's Glock, without manual reloading, via a single function of the trigger. *See* 26 U.S.C. § 5845(b). In light of the above, I have probable cause to believe that COLEMAN's possession of the switch-equipped Glock pistol seized from him on March 21, 2026, constitutes a felony violation of 18 U.S.C. § 922(o)(1). *See* 18 U.S.C. § 924(a)(2).

16. From my training and experience, I know that, as illegal machineguns, "Glock switches" cannot be purchased on the open gun market. Much like illegal drugs, they must be found and purchased on the black market—a market which, like any other in the modern day, is almost invariably facilitated by the use of wireless telephones like the TARGET DEVICE. Also, because of

---

[3] *See* U.S. Patent No. 5,705,763 (Jan. 6, 1998).

a switch's ability to maximize damage and death, I have learned that American criminal street gangs increasingly prize them as symbols and instruments of power. I know from training and experience that street gang members commonly use the digital camera capabilities of wireless telephones like the TARGET DEVICE to photograph and/or record videos of themselves and their associates holding, carrying and displaying switches and switch-equipped firearms, as well as narcotics and cash. Once created, such photos and videos are also commonly uploaded to the Internet or sent to specific recipients using wireless telephones like the TARGET DEVICE, with the intent of impressing or intimidating the viewer—often rival gang members. Additionally, evidence of who owns and has controlled the TARGET DEVICE—something which is nearly always ascertainable from a wireless telephone's contents, in my training and experience—will also tend to prove ownership and control of the *other* property carried in the Charger, including the switch-equipped Glock pistol, marijuana, drug paraphernalia and other contraband. Given all of the above, I have probable cause to believe the TARGET DEVICE is or contains evidence, fruits and instrumentalities of COLEMAN's knowing violation of 18 U.S.C. § 922(o)(1), as well as of the other SUBJECT OFFENSES.

17. From information provided to me by FSPD, I know the TARGET DEVICE has remained in that agency's custody, in the Western District of Arkansas, at all times since its initial seizure on March 21, 2026. Based on my training and experience, as informed by FSPD, I also know the TARGET DEVICE has been stored in a manner that reasonably assures its contents have not been substantially altered since the time it was seized.

18. From my training and experience, I know that drug dealers almost invariably utilize wireless telephones like the TARGET DEVICE to communicate with their sources of supply, their customers, and among each other, including during the transportation and distribution of illegal drugs.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19. Based on my knowledge, training, and experience, I know that electronic devices like the TARGET DEVICE can store information for long periods of time. Similarly, things that have been viewed via the Internet on devices like the TARGET DEVICE are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be found on the TARGET DEVICE because, among other things:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.

Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device to violate the referenced statutes, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

21. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit forensic and other examination of the TARGET DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the TARGET DEVICE to human inspection in order to determine whether it is evidence described by the warrant.

22. *Manner of execution.* Because this warrant only seeks permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve a physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**BIOMETRICS**

23. The requested search warrant would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock the TARGET DEVICE. I seek this authority based on the following:

24. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices—particularly newer mobile devices, like the TARGET DEVICE—offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

25. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

26. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

27. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

28. As discussed in this affidavit, the TARGET DEVICE was seized at the time of COLEMAN's March 21, 2026, arrest. The passcode or password that would unlock the TARGET DEVICE may be unknown to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the TARGET DEVICE without making the use of biometric features necessary to the execution of the search authorized by this warrant.

29. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot generally be unlocked using Touch ID when (1) more than

48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

30. Due to the foregoing, if law enforcement personnel find that the TARGET DEVICE may be unlocked using one or more of the aforementioned biometric features, the warrant sought would permit law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of any individual reasonably believed to be a user of the TARGET DEVICE, including COLEMAN, to any fingerprint scanner of the TARGET DEVICE; and/or (2) hold the TARGET DEVICE in front of the face of any such person, including COLEMAN, in order to activate any facial recognition feature, for the purpose of unlocking and searching the TARGET DEVICE.

**CONCLUSION**

31. Based on the foregoing, I respectfully submit that I have probable cause to believe that the evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distributing and/or possessing with intent to distribute controlled substances), 21 U.S.C. § 843(b) (using a communications facility in committing, causing or facilitating a drug trafficking felony), 21 U.S.C. § 846 (attempting and/or conspiring to commit the above-described offenses), 18 U.S.C. § 924(c) (using, carrying or possessing a firearm in relation to, or in furtherance of, a drug trafficking felony) and 18 U.S.C. § 922(o) (unlawful possession of a machinegun) described in Attachment B, are presently stored in the TARGET DEVICE described in Attachment A.

32. I therefore respectfully request that this Court issue a warrant authorizing the search of the TARGET DEVICE for, and the seizure of, the items described in Attachment B.

**REQUEST FOR SEALING**

33. It is respectfully requested that this Court issue an order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, this affidavit, and Search Warrant, and the requisite inventory notice (with the exception of one copy of the warrant and the inventory notice that will be left with the TARGET DEVICE, and later provided to COLEMAN). The target, COLEMAN, is now charged with certain state offenses, but has been released on bond. Premature disclosure of the contents of this affidavit and related documents may therefore have a significant negative impact on this investigation, and could jeopardize its effectiveness by alerting COLEMAN, or others working on his behalf, to: 1) how it is being conducted; and 2) what other evidence—particularly electronic—the government might pursue next. As such, sealing is appropriate so as to deny COLEMAN, or others working on his behalf, an opportunity to destroy or tamper with evidence.

Respectfully submitted,

SA Tim S. Barth

Special Agent Timothy S. Barth
Federal Bureau of Investigation

Attested to by the Affiant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone call to 870-773-2005 on this 9th day of April 2026.

Mark E. Ford

HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**
(1 Page)

**DESCRIPTION OF THE PROPERTY TO BE SEARCHED**

The property to be searched is a blue Apple 'iPhone' wireless telephone (model number: unknown; serial number: unknown; International Mobile Equipment Identifier (IMEI): unknown; assigned telephone number: unknown) now held in the secure custody of the Fort Smith Police Department (FSPD), located at 100 S. 10th Street, Fort Smith, Arkansas, in the Western District of Arkansas, under FSPD incident/evidence number: 26018197-5 (hereinafter the "TARGET DEVICE"). Two photographs of the TARGET DEVICE follow:



TARGET DEVICE front



TARGET DEVICE back

**ATTACHMENT B**
(4 Pages)

**ITEMS TO BE SEARCHED FOR AND SEIZED**

The items to be searched for and seized include all documents, records, data and/or information, in whatever form, constituting, comprising, including or containing, in whole or in part, evidence of violations of 21 U.S.C. § 841(a)(1) (distributing and/or possessing with intent to distribute controlled substances), 21 U.S.C. § 843(b) (using a communications facility in committing, causing or facilitating a drug trafficking felony), 21 U.S.C. § 846 (attempting and/or conspiring to commit the above-described offenses), 18 U.S.C. § 924(c) (using, carrying or possessing a firearm in relation to, or in furtherance of, a drug trafficking felony) and 18 U.S.C. § 922(o) (unlawful possession of a machinegun), or any essential element of any one or more of those offenses, as well as any property used in, or designed or intended for use in, the commission of such offenses, and any fruits of such offenses, including, but not necessarily limited to:

1. lists of, or information regarding, drug or other contraband customers and related identifying information;

2. types, amounts, and prices of drugs and other contraband bought and sold, as well as dates, places, and amounts of specific transactions;

3. information related to sources of drugs, including names, addresses, phone numbers, and any other identifying information;

4. information regarding the TARGET DEVICE and/or its owner or user's, schedule, location and/or travel **between January 1, 2026, and the date the TARGET DEVICE was seized, March 21, 2026**;

5. records, information and/or data, in whatever form, relating to the identity(ies) of the person(s) suspected of violating the statutes described above; and

6. records, information and/or data, in whatever form, tending to establish who owned, controlled and/or used the TARGET DEVICE before, during and after the violations described above, and how and when, including, but not limited to, logs, caches, registry entries, configuration files, saved usernames and passwords, documents, browsing history, cookies, "bookmarked" and "favorited" web pages, user-entered Internet search terms,

records of user-typed Internet addresses, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

7. evidence of software, or the lack of software, that would allow others to control the TARGET DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

8. records, information and/or data, in whatever form, tending to establish the TARGET DEVICE user's knowledge, intent and/or state of mind, as it relates to the violations described above, before, during, or after those violations;

9. evidence of the attachment to the TARGET DEVICE of other computers, computer hardware, storage devices, or other containers for electronic evidence, before, during or after the above-described violations;

10. evidence of programs (and associated data) that are designed to eliminate data from the TARGET DEVICE;

11. passwords, encryption keys, and other access devices that may be necessary to access the TARGET DEVICE;

12. documentation and manuals that may be necessary to access the TARGET DEVICE or to conduct a forensic examination of it;

13. records, information and/or data, in whatever form, regarding Internet Protocol addresses used by the TARGET DEVICE;

14. all communications, media, and related data relevant to the above-described violations;

15. bank records, checks, credit card bills, account information, and other financial transaction records or information which are relevant to the above-described violations; and

16. records, information and/or data, in whatever form, evidencing the use of the TARGET DEVICE associated with social media platforms and similar chat-based applications' servers.

17. Any and all contextual information, in whatever form, necessary to understand the evidence described above.

This search warrant specifically authorizes law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of any individual reasonably believed to be a user of the TARGET DEVICE to any fingerprint scanner of such device(s); and/or (2) hold the TARGET DEVICE in front

of the face of any such persons in order to activate any facial recognition feature, for the purpose of attempting to unlock such device(s) so that their contents may be searched as authorized by this warrant.

This search warrant also specifically authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described herein. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

As used herein:

1. the terms "records" and "information" include all of the foregoing items of evidence in whatever form, and by whatever means, they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form;
2. the term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, video gaming systems and peripheral devices, mobile phones, tablets, server computers, and network hardware;
3. the term "computer hardware" includes all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing

devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks); and

4. the terms "storage media" or "storage medium" include any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.